**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

NORTH AMERICAN DERIVATIVES EXCHANGE, INC., d/b/a OG.COM PREDICTION MARKETS,

*Plaintiff*,

v.

TIM GRIFFIN, in his official capacity as Attorney General for the State of Arkansas; ALEX LIEBLONG, in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission; MARK LAMBERTH, in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission; STEVE ANTHONY, in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission; DENNY EAST, in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission; MICHAEL POST, in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission; JOHN SCHMELZLE, in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission; STEVE LANDERS, in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission,

*Defendants*.

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 09 2026

TAMMY H. DOWNS, CLERK
By: ________ DEP CLERK

Civil Action No. 4:26-cv-1226-KGB

This case assigned to District Judge Baker
and to Magistrate Judge Harris

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff North American Derivatives Exchange, Inc., d/b/a OG.com Prediction Markets ("OG.com")[1], by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1. OG.com seeks declaratory and injunctive relief to restrain the Office of the Attorney General of Arkansas ("State Attorney General") and Commissioners of the Arkansas Racing & Gaming Commission ("ARC") (collectively, "Defendants") from improperly and under color of Arkansas state law assuming jurisdiction over, regulating, or terminating OG.com's listing of lawful derivatives contracts on its federally regulated market.

2. OG.com is a designated contract market ("DCM") regulated by the U.S. Commodity Futures Trading Commission ("CFTC") that lists event contracts, including sports event contracts, for trading in interstate commerce. OG.com has operated as a federally regulated DCM since 2004.[2] All of its products are certified pursuant to the CEA and established CFTC rules and are offered in compliance with CFTC regulations, including standards for contract specifications, market integrity, and trader protections. As a CFTC-registered self-regulatory organization, OG.com also administers a comprehensive market regulation program, functioning

---

1 North American Derivatives Exchange, Inc. launched OG.com in February of 2026 to provide a separate technology platform for users to access listed event contracts, distinct from the company's other offerings. *See* N. Am. Derivatives Exch., *OG.com or OG is a New Brand Association with the Exchange's Prediction Market Offering of Derivatives* (Feb. 4, 2026), https://www.nadex.com/notices/og-com-or-og-is-a-new-brand-associated-with-the-exchanges-prediction-market; Crypto.com, *Crypto.com Launches "OG"—a New Prediction Market Experience* (Feb. 3, 2026), https://crypto.com/us/company-news/cryptocom-launches-og-a-new-prediction-market-experience.

2 The CFTC's orders approving North American Derivative Exchange, Inc.'s designation as a DCM are publicly available on the CFTC's Industry Filings page. *See Industry Filings, N. Am. Derivatives Exchange, Inc.*, CFTC, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations/34536.

in a regulatory capacity to oversee trading in its markets. This program is subject to CFTC oversight and has been reviewed and approved by the CFTC.

3. OG.com offers event contracts to Arkansas residents in the state of Arkansas under the authority granted to it by the CFTC. The State Attorney General has purported to assert jurisdiction over KalshiEx LLC ("Kalshi"), another federally regulated DCM, and its affiliates, by filing suit to enjoin Kalshi's offering of event contracts, recoup alleged "losses" suffered by Arkansas citizens, disgorge amounts Kalshi received in the state, impose restitution and civil fines, recover the costs of the state's attorneys' fees, and request other relief. *Arkansas v. KalshiEx LLC*, No. 32cv-26-717 (Independence Cnty. Cir. Ct. Nov. 4, 2026) (the "Kalshi Enforcement Action"). Consistent with the Kalshi Enforcement Action and Defendants' public statements evincing an intent to attempt to enforce Arkansas gambling laws against federally regulated exchanges, Defendants will take the same action against OG.com. *See infra* ¶¶ 81-86.

4. The crux of Defendants' assertion of authority is their conclusion that, notwithstanding federal regulation, contracts traded on DCMs are "illegal gambling operations" subject to Arkansas gambling laws. Complaint ¶¶ 8-16, *Arkansas v. KalshiEx LLC*, No. 32cv-26-717 (Independence Cnty. Cir. Ct. Nov. 4, 2026) (the "Kalshi Compl."). But Defendants ignore that through the Commodity Exchange Act ("CEA"), Congress expressly vested the CFTC with "exclusive jurisdiction" over DCMs and the products they make available for trading, including whether to prohibit certain event contracts—such as contracts related to gaming—as contrary to the public interest. 7 U.S.C. § 2(a)(1)(A); 7 U.S.C. § 7a-2(c)(5)(C).

5. According to the CEA and CFTC, "event contracts," such as those offered by OG.com, are derivatives or swaps whose returns are "dependent on the occurrence, nonoccurrence,

or the extent of the occurrence of an event or contingency."[3] At issue here are OG.com's event contracts, with return profiles dependent on the occurrence of specified events, for example, a certain sports team or participant winning or losing. OG.com's event contracts were certified and became effective under the CEA's self-certification process. The CFTC has not prohibited OG.com's event contracts as being contrary to the public interest.

6. OG.com brings this action to obtain declaratory and injunctive relief to protect its right to offer event contracts pursuant to federal law and regulation. Indeed, any enforcement action by Arkansas would be meritless, and any attempted enforcement efforts would be preempted by the CEA.

7. Congress has expressly preempted state regulation of trading on DCMs by granting the CFTC "exclusive jurisdiction" to regulate trading on DCMs, including of options and "transactions involving swaps." 7 U.S.C. § 2(a)(1)(A). A savings clause allows states to regulate conduct that does *not* fall within the CFTC's exclusive jurisdiction, confirming that the CFTC's exclusive jurisdiction is indeed exclusive. *See id.*

8. Arkansas's regulation of trading on DCMs is also preempted because Congress has fully occupied the field of regulating federally registered DCMs, thereby preempting any overlapping state laws including state licensing or registration conditions that Arkansas might purport to apply to OG.com. Because OG.com's event contracts are lawfully traded on a CFTC-registered DCM, federal law overrides state licensing or registration conditions that might otherwise apply, including those cited by the State Attorney General in the Kalshi Enforcement

---

[3] *See* Commodity Exchange Act, 7 U.S.C. § 1a(47); *Industry Oversight: Contracts & Products*, CFTC, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm. Examples of "event contracts" listed on the CFTC website include predicted corporate earnings, level of snowfall, and dollar value of damage caused by a hurricane. *Id.*

Action. Kalshi Compl. ¶¶ 8-16, 28-49, 69-94 (alleging that Kalshi's event contract activities violate Ark. Const. amend. 100. §§ 1-4; Ark. Code Ann. §§ 5-66-103, 5-66-104, 5-66-106; 23 Ark. Code R. §§ 358-2001 et seq.).

9. Insofar as it would prohibit OG.com from listing contracts that are authorized under federal law, Arkansas law is also preempted because it conflicts with the CEA's framework. OG.com cannot comply with both its federal law obligations and any purported obligations under Arkansas law. Arkansas law also undermines the CEA's goals of, among other things, creating a uniform system of derivatives trading. This conflict between the CEA and state law is not just hypothetical. In the past several months, the CFTC has issued orders in New York and Michigan directing DCM Kalshi and its affiliates to continue performing their functions as federally regulated exchanges in direct response to state regulators' attempted enforcement of state law. *See infra* ¶¶ 69-70.

10. The threat of Defendants' attempted enforcement of Arkansas law poses a direct and imminent threat to OG.com's business and its users and disrupts the comprehensive federal framework that places OG.com exclusively under the CFTC's supervision.

11. A declaratory judgment and injunction are necessary to prevent Defendants' unlawful intrusion into a market which they have no legal authority to regulate.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the Constitution and the laws of the United States—specifically, whether Arkansas law is preempted by the CEA as applied to OG.com's event contracts. The Court also has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to declare the rights and legal relations of the parties.

13. This Court has personal jurisdiction over the Defendants. The Defendants are domiciled in Arkansas and perform their official duties in Arkansas.

14. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). The Defendants perform their duties and thus reside in this District. A substantial part of the events giving rise to the claims occurred in this District.

15. The Eleventh Amendment does not bar this action. OG.com sues only state officials, in their official capacities, for prospective declaratory and injunctive relief to halt the threatened enforcement of state law that violates federal law. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002); *Mo. Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007) (Eleventh Amendment does not bar a suit to enjoin a state official who has some connection with the enforcement of an allegedly unconstitutional statute).

**PARTIES**

16. Plaintiff North American Derivatives Exchange, Inc., doing business as OG.com Prediction Markets, is a financial services company with its principal place of business in Chicago, Illinois. OG.com operates a DCM and Derivatives Clearing Organization regulated by the CFTC under the CEA, where users can trade financial products, including event contracts.

17. Defendant Tim Griffin is the Attorney General for the State of Arkansas and is sued in his official capacity. The State Attorney General is the state's chief legal officer, tasked with maintaining and defending the interests of the State. *See* Ark. Code Ann. §§ 25-16-703.

18. Defendant Alex Lieblong is sued in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission.

19. Defendant Mark Lamberth is sued in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission.

20. Defendant Steve Anthony is sued in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission.

21. Defendant Denny East is sued in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission.

22. Defendant Michael Post is sued in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission.

23. Defendant John Schmelzle is sued in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission.

24. Defendant Steve Landers is sued in his official capacity as a Commissioner of the Arkansas Racing & Gaming Commission.

25. Together, Defendants Tim Griffin, Alex Lieblong, Mark Lamberth, Steve Anthony, Denny East, Michael Post, John Schmelzle, and Steve Landers are responsible for purporting to enforce Arkansas state laws that are preempted by federal law as applied to OG.com.

## **FACTUAL ALLEGATIONS**

26. Defendants have sought to enforce state gambling laws against Kalshi, another federally regulated exchange subject to the CFTC's exclusive jurisdiction. Defendants' action against Kalshi is consistent with their public statements evincing an intent to enforce gambling laws against federally regulated exchanges and their support for state regulators in event contract litigation around the country. *See infra* ¶¶ 81-86. Thus, there is a concrete and imminent threat that Defendants will take the same actions against OG.com as they did against Kalshi. Because the CFTC has exclusive jurisdiction over federally registered markets and intermediaries,

Defendants' efforts to prohibit the trading of event contracts listed on federally regulated markets are preempted by federal law. OG.com is entitled to a judicial declaration that its activities are not subject to Defendants' oversight, regulation, or jurisdiction, as well as an injunction barring Defendants from any future attempted enforcement efforts.

### A. OG.com Is a Federally Regulated DCM That Lists Event Contracts for Trading

27. OG.com is a federally regulated DCM that provides a market for trading a variety of derivatives products, including event contracts, some of which are based on the occurrence, non-occurrence, or extent of occurrence of events or contingencies associated with live sporting events.

28. The CFTC first approved OG.com as a DCM in 2004, confirming that its market complied with the CEA. Most recently in September 2025, the CFTC amended its registration, again confirming OG.com's compliance with the CEA. For two decades, the entity now known as OG.com has operated continuously as a CFTC-regulated market offering event contracts.

29. As an early entrant in the regulated event contract space, OG.com specializes in event contract trading and has steadily expanded its offerings over time. Its market provides a secure, federally approved exchange where individual, retail, and institutional participants can hedge risk tied to event-based outcomes.

30. On January 30, 2025, pursuant to 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. § 40.2(a), OG.com certified and announced its intention to list a new category of event contracts: "Industry Event - Live Presentations" contracts.[4] These contracts allow users to trade on the occurrence,

---

[4] North American Derivative Exchange, Inc.'s January 30, 2025 certification pertaining to sports event contracts is publicly available on the CFTC's website. *Industry Filings, Certification of Contingent Derivatives Contract (Industry Event–Live Presentations–NAICS 711)–Submission Pursuant to Commission Regulation 40.2(a)*, CFTC (Jan. 30, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01302514705.pdf (hereinafter, "January 30, 2025 Certification Filing," attached as Exhibit A).

non-occurrence, or extent of occurrence of events or contingencies relating to lawful live events in the performing arts, spectator sports, and related industries, provided the users themselves are not participants in the events. *See* Ex. A at 4-5.

31. OG.com designed these event contracts "to manage the risk of a variety of market participants, whose businesses face economic consequences based on the outcome of a respective Industry Event, and to enable price discovery for related commercial enterprises." *Id.* at 8. These event contracts are also "designed . . . to meet the varied and diverse hedging and market needs of commercial firms and individuals impacted by or with an economic interest in the Industry Event outcome." *Id.* at 2. Examples include contracts tied to the winner of an award like "Best Picture," the location of a flagship event or ceremony, the winner of a live sporting event like the Super Bowl, or whether there will be a Major League Baseball lockout.

32. OG.com's currently listed "Industry Event - Live Presentations" contracts, including sports event contracts, were certified and became effective under the CEA's self-certification process described *infra* ¶¶ 44-51.

33. OG.com subsequently certified additional event contracts that reference the occurrence, non-occurrence, or extent of occurrence of events or contingencies associated with live sporting events, including its certification of "Contingent Derivatives Deci Contract (Industry Event–Live Presentations–NAICS 711)," filed on July 30, 2025,[5] and "Derivatives Contract

---

[5] North American Derivative Exchange, Inc.'s July 30, 2025 certification pertaining to sports event contracts is publicly available on the CFTC's website. *Industry Filings, Certification of Contingent Derivatives Deci Contract (Industry Event–Live Presentations–NAICS 711)–Submission Pursuant to Commission Regulation 40.2(a)*, CFTC (July 30, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/07/ptc07302527650.pdf.

(Industry Event–Live Presentations–Statistics)," filed on August 29, 2025.[6] As with the sports event contracts certified under OG.com's January 30, 2025 Certification Filing, OG.com identified in these certifications the financial, commercial, and economic consequences associated with the underlying events.

### B. The CFTC Has Exclusive Jurisdiction to Regulate Derivatives Contracts on Federally Registered Markets

34. Derivatives are financial instruments used to allocate risk between counterparties. The archetypal example is a grain futures contract, which allows buyers to lock in prices and manage volatility in agricultural markets by agreeing to buy or sell a specified amount of the crop at a fixed price on a future date.

35. As financial markets have matured, the category of derivatives has expanded significantly beyond futures based on agricultural commodities, enabling participants to hedge against volatility across a wide array of tangible and intangible areas, including commodities like gold, financial benchmarks such as interest rates, and even weather or credit risk. In principle, nearly any form of risk—economic, environmental, or event-driven—can be hedged if a CFTC-regulated market exists and a contract is available.

36. For more than a century, the federal government has regulated national derivatives markets in order to promote uniformity and integrity in national trading.

37. Before the adoption of the CEA, futures contracts were often viewed with suspicion by state legislatures. Because derivatives markets necessarily involve the exchange of money tied

---

[6] North American Derivative Exchange, Inc.'s August 29, 2025 certification pertaining to sports event contracts is publicly available on the CFTC's website. *Industry Filings, Certification of Derivatives Contract (Industry Event–Live Presentations –Statistics)–Submission Pursuant to Commission Regulation 40.2(a)*, CFTC (Aug. 29, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/08/ptc08292529772.pdf.

to uncertain outcomes, some states equated them to gambling and sought to restrict or prohibit their use. This led to a disjointed and often conflicting state-by-state approach.

38. The CEA, enacted in 1936, was intended to replace the fragmented system of state oversight with a uniform federal framework for regulating futures markets. It extended federal authority beyond grain to a broader class of commodities and created the Commodities Exchange Authority, a division within the Department of Agriculture charged with monitoring trading practices and prosecuting price manipulation. But the CEA did not initially establish an independent federal agency to comprehensively regulate the nation's derivatives markets. As markets grew more complex, lawmakers and industry participants became concerned that the lack of centralized enforcement would invite states to regulate futures trading on their own, leading to inconsistent standards across jurisdictions.

39. In response, Congress enacted sweeping amendments to the CEA in 1974 (the "1974 Act"), which established the CFTC as an independent federal agency charged with regulating the national derivatives markets. To eliminate the threat of conflicting state regulation, Congress expressly granted the CFTC "exclusive jurisdiction" over derivatives trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A).

40. Proponents of the 1974 Act warned that, absent a single national regulator, "states . . . might step in to regulate the futures markets themselves," subjecting national exchanges to "conflicting regulatory demands." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). As one Senator put it, "different State laws would just lead to total chaos." *Commodity Futures Trading Commission Act: Hearings Before the Sen. Comm. on Agric. & Forestry*, 93rd Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). The House Agriculture Committee stressed the need to bring "all exchanges and all

persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 82 (1974). To that end, the Senate deliberately removed a provision of the CEA that would have preserved state regulatory authority "in order to assure that [f]ederal preemption is complete." 120 Cong. Rec. 30,464 (1974) (statements of Sen. Curtis, supported by Sen. Talmadge).

41. Congress has continued to amend the CEA, with each amendment further underscoring its intent to vest the CFTC with exclusive authority over derivatives markets. Indeed, the 1992 Futures Trading Practices Act ("FTPA") authorized the CFTC, in order to promote innovation, to exempt certain financial instruments from the requirement that they be traded on a registered exchange. *See* 7 U.S.C. § 6(c). Because the preemption provision in 7 U.S.C. § 2 applies only to derivatives traded on CFTC-registered markets, Congress included a separate provision explicitly preempting "any State or local law that prohibits or regulates gaming" with respect to any agreement, contract, or transaction exempted from the exchange-trading requirement. 7 U.S.C. § 16(e)(2). That provision extended the scope of federal preemption to off-exchange transactions under the CFTC's oversight, reinforcing Congress's intent to create a comprehensive and uniform federal framework for derivatives regulation.

42. In 2010, Congress further expanded the CFTC's exclusive jurisdiction over derivatives markets by amending the CEA through the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"). Congress added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction, *see id.* § 2(a)(1)(A), and expressly delegated authority to the CFTC and SEC to "further define" swaps as needed. 15 U.S.C. § 8302(d)(1). Congress also established a "Special Rule" expressly granting the CFTC discretionary authority to determine whether specific event contracts, including those that

reference terrorism, assassination, war, gaming, activity that is unlawful under federal or state law, or another similar activity, are "contrary to the public interest" and, if so, to prohibit them from trading on DCMs. 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule expressly contemplated CFTC regulation of sports-related event contracts by giving the CFTC authority to prohibit event contracts related to "gaming" if those contracts are contrary to the public interest. The Special Rule does not require the CFTC to disallow event contracts referencing these underlying activities, but rather grants the agency the discretion to conduct a public interest review based on its own criteria.

43. This long history reinforces Congress' intent to create a national market for derivatives products despite individual states preferring to prohibit or regulate them.

### C. Event Contracts Are Swaps Under the CEA With Price Discovery Benefits, Predictive Value, and Allow Businesses to Hedge Risk

44. DCMs list event contracts for trading in interstate commerce. Event contracts are exchange-traded financial instruments, known as derivatives or swaps, which the CEA broadly defines as relating to any "occurrence, extent of an occurrence, or contingency," 7 U.S.C. § 7a-2(c)(5)(C)(i) (special rule), that is "beyond the control of the parties to the relevant contract," § 1a(19)(iv) (defining "excluded commodity"), and "associated with a potential financial, economic, or commercial consequence," *id.* § 1a(47)(A)(ii) (defining "swap"); *see also KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 226 (3d Cir. 2026) ("'[S]wap' includes event contracts."), *petition for cert. docketed*, No. 26-299 (U.S., Sep. 8, 2026).[7]

45. Event contracts typically reference the occurrence or non-occurrence of an event or contingency, represented by "yes" or "no" positions. A trader who takes an event contract with

---

[7] Events themselves are an excluded commodity under the CEA. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

the "yes" position profits if the specified event or contingency occurs by the expiration date, while the "no" position purchaser profits if it does not. An active position may also be closed at a profit or loss prior to the occurrence or non-occurrence of the specified event or contingency.

46. An event contract might be tied to specified movements of a financial index or a real-world event. For example, an event contract could be tied to changes in the yield on the 10-year U.S. Treasury note, the magnitude of the upcoming hurricane season, or to the events or contingencies associated with political, scientific or live sporting events. But, outside of its authority to prohibit specifically enumerated event contracts that it subsequently determines are contrary to the public interest, the CFTC does not purport to define what events are or are not properly the subject of event contracts. Rather, the regulatory approach that Congress has directed and that the CFTC has pursued is to allow the market to define the nature of the events on which parties wish to contract.

47. The price of an event contract is determined by market forces, namely the supply and demand for entering into the "yes" and "no" positions of the contract. An event contract has a set expiration date, and the price of an event contract will fluctuate along with the market's perception of the likelihood of an event's occurrence until settling at a final price on the expiration date.

48. Trading event contracts is not the same as sports wagering. There are several fundamental features that distinguish the two, including:

- <u>Counterparty</u>: DCMs are not a counterparty to or trader in their event contracts; rather, they facilitate a neutral market for trading among market participants. By contrast, with sports wagering, the house/bookmaker is the counterparty to the transaction.

- <u>Revenue model</u>: DCMs charge a per-contract transaction fee, and their revenue is not dependent on the outcome of the contract. By contrast, with sports wagering, the house profits only when customers lose.

- <u>Price discovery</u>: The prices of event contracts are set in real time by supply and demand among market participants, and market participants can hedge exposure to events on which the contract is based. With sports wagering, odds are set solely by the house or sportsbook.

- <u>Purchaser</u>: Businesses, not just individuals, can purchase and trade event contracts. With sports wagering, only natural persons can place bets.

- <u>Payout structure</u>: Event contracts are based on a fixed notional value where settlement turns on whether the specified contingency occurs. With sports wagering, payout is determined by house-set odds at the time of the bet.

- <u>Tradability</u>: Positions in event contracts can be bought, sold, and re-traded before expiration, and prices fluctuate with market perceptions. With sports wagering, bets are generally not transferable or revisable once placed.

- <u>Transparency</u>: DCMs must publish daily settlement prices, volume, and open interest for its event contracts. There are no comparable public disclosure requirements for sportsbooks or casinos.

49. Because of the way event contracts are structured, they allow market participants, including those with a financial stake in the occurrence or non-occurrence of a particular event or contingency, to hedge against related risks. These contracts have become a valuable risk management tool because they are linked to real-world events with commercial consequences and offer public utility by reflecting the market's aggregated expectations about whether those events will occur. Event contracts where the underlying event relates to a sporting event may be used to hedge this type of risk across a variety of commercial scenarios, *see* Ex. A, including:

- Media and broadcasting companies that face financial exposure tied to viewership, which can fluctuate significantly depending on how competitive or compelling a game is;

- Retailers that sell team merchandise or apparel who see major swings in sales depending on whether a popular team advances or whether a player affiliated with their brand wins a championship;

- Travel and hospitality businesses that experience spikes in bookings if a local team advances or hosts a high-profile event, creating exposure to outcomes they cannot control;

- Restaurants and bars located around arenas such as Madison Square Garden, for example, can hedge against the risk of unexpected interruption to their business from major events[8] or whether additional games in the NBA finals will be played in the arena;

- Consumer goods companies, especially in the food and beverage industry, that run promotions tied to game results. These campaigns, while effective for marketing, can carry substantial liabilities if the promotional conditions are met. Advertisers and retailers offering giveaways or rebates based on a team's success face similar exposure; and

- Fantasy sports platforms and sports data providers that rely on fan engagement and player performance, where a dull game or early elimination of a key player can significantly reduce user participation and revenue.

50. There are numerous examples where sports event contracts have been used to hedge risk. Game Point Capital, an insurance company that specializes in sports organizations, says that it has "arranged millions of dollars' worth of hedges through Kalshi."[9] Industry commentary has highlighted that sports event contracts will allow "small businesses that outright *depend on* a full 162-game MLB regular season schedule each year" to hedge their risks during a potential Major League Baseball ("MLB") lockout in 2027.[10] These businesses can currently use OG.com to trade

---

[8] *See, e.g.*, Devin Gannon, *NYPD Closes Area Around MSG for Knicks Game*, 6sqft N.Y.C. (June 10, 2026), https://www.6sqft.com/nypd-closes-area-around-msg-for-knicks-game; Charlie McKenna, *Boston PD to Shut Down Area Around TD Garden During Celtics NBA Finals Game*, Mass Live (June 17, 2024), https://www.masslive.com/news/2024/06/boston-pd-to-shut-down-area-around-td-garden-during-celtics-nba-finals-game.html.

[9] *See* Andrew Ross Sorkin et al., *Prediction Markets' Next Major Bet: Wall St. Traders*, N.Y. Times DealBook (June 17, 2026), https://www.nytimes.com/2026/06/17/business/dealbook/hedging-prediction-markets-kalshi.html.

[10] *See* David Huber, *Prediction Market Hedging Could Become Mainstream During 2027 MLB Negotiations*, Deadspin (July 8, 2026), https://deadspin.com/prediction-markets/legal-news/prediction-market-hedging-could-become-mainstream-during-2027-mlb-negotiations; *see also* Joe Peta (@MagicRatSF), X (Aug. 5, 2026, 12:59 A.M.), https://x.com/MagicRatSF/status/2084866766732423467?s=46 (noting the extremity of the "binary economic impact for dozens of cities, hundreds of business and thousands of people" the outcome of Kalshi's market for how many MLB games will be played next season has, such that "[w]e should be cheering @Kalshi for its existence").

an event contract regarding "Will Pro Baseball and the US Pro Baseball Players Association Reach a New [Collective Bargaining Agreement] Before December 2, 2026?" i.e., whether a lockout will occur, and on an event contract regarding whether the "Pro Baseball Regular Season Start Date 2027 [will be] Before April 1, 2027." Without the ability to hedge these risks using event contracts, "[l]ocal bars, food vendors, parking lots, souvenir shops, and even ticket scalpers could see their revenues catastrophically slide if the MLB regular season is canceled or shortened due to stalled negotiations." *Id.*

51. These are just a few examples, but they underscore a broader point: Many businesses across diverse industries have meaningful financial exposure to the occurrence, non-occurrence, or extent of occurrence of events or contingencies connected to sporting events and may seek to manage that risk through event contracts.

### D. The CEA and CFTC Regulations Establish a Comprehensive Federal Regulatory Framework for Trading in Event Contracts and Other Derivatives

52. The federal regulatory framework governing DCMs and the trading of derivatives contracts on DCMs is longstanding, comprehensive, and well-established.

53. To offer derivatives for public trading, an entity must obtain designation from the CFTC as a contract market. *See* 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).

54. To receive this designation, an applicant must submit detailed materials demonstrating compliance with the CEA's "Core Principles." *See* 17 C.F.R. § 38.3(a)(2); 7 U.S.C. § 7(d). This requires it to show it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement, and (5) adopt position limitations for

each contract to reduce the threat of market manipulation. *See* 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

55. If approved by the CFTC and granted designation as a contract market, a DCM becomes subject to an extensive federal regulatory framework administered by the CFTC. DCMs are required to meet a wide range of ongoing regulatory obligations to remain in good standing, including: prescriptive capital and liquidity requirements, participant eligibility requirements, reporting obligations, recordkeeping requirements, and numerous operational and governance standards directed toward compliance with the CEA and its Core Principles. *See* 17 C.F.R. §§ 38.1101, 38.604, 38.1051(*l*), 38.950, 1.31, 38.450, 38.451; 7 U.S.C. § 7(d); *see generally* 17 C.F.R. pt. 38.

56. Moreover, because of the breadth and depth of the regulatory framework applicable to a DCM, a market that has earned the CFTC's designation is granted the status of a self-regulatory organization under federal law. As such, DCMs are entrusted with front-line responsibilities for establishing rules and enforcing their compliance, detecting and preventing market abuses, and ensuring the integrity of their listed products and intermediaries. *See* 17 C.F.R. § 1.3; *see generally* 17 C.F.R. pt. 38. Specifically, DCMs must adhere to product-related regulatory standards and certify that each new contract complies with applicable law by filing a written certification with the CFTC prior to the time of listing. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).

57. Written certifications are subject to CFTC regulation, and the CFTC may initiate a formal review of any submitted contract under its authority. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §§ 40.2, 40.11(c). After a stipulated period of time, if the CFTC does not take action, the contract

is deemed "effective" and may be listed on the DCM for trading. *See* 7 U.S.C. § 7a-2(c); *see also* 17 C.F.R. § 40.2 (outlining the process for listing products for trading by certification).

58. In addition to regulatory oversight authority, the CFTC possesses exclusive and comprehensive enforcement powers with respect to DCMs, their intermediaries, and market participants.

59. The CFTC's Division of Enforcement may initiate investigations and, with the approval of a majority of the Commission, bring enforcement actions in federal court or through administrative proceedings. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3. If the Division concludes that a violation of the CEA has occurred, it may recommend the Commission pursue a broad range of remedies, including civil monetary penalties, restitution, and disgorgement, as well as the suspension, denial, revocation, or restriction of registration and trading privileges. *Id.* The Commission may also pursue injunctive relief, including cease-and-desist orders, and can refer criminal violations to the Department of Justice for prosecution. *Id.*

### E. The CFTC Has Repeatedly Confirmed Its Exclusive Authority Over Event Contracts Traded on DCMs

60. The CFTC has confirmed numerous times that it has exclusive authority over event contracts traded on DCMs. The CFTC has brought actions against the states and state regulators in nine states, alleging that federal law preempts state law regulating event contracts traded on federally regulated markets. *See United States & CFTC v. Arizona*, No. 2:26-cv-2246 (D. Ariz. Apr. 2, 2026); *United States & CFTC v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026); *United States & CFTC v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States & CFTC v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026); *United States & CFTC v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026); *United States & CFTC v. Minnesota*, No. 0:26-cv-02661 (D. Minn. May 19, 2026); *United States & CFTC v. New Mexico*, No. 1:26-cv-

01912 (D.N.M. June 12, 2026); *United States & CFTC v. Kentucky*, No. 3:26-cv-00049 (E.D. Ky. June 23, 2026); *United States & CFTC v. Utah*, 2:26-cv-01055 (D. Utah).

61. The CFTC also moved to intervene in a lawsuit brought by Kalshi against state regulators in Rhode Island. *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026) ECF No. 19. The CFTC has also submitted briefs as an amicus curiae supporting OG.com's action brought against state regulators in Nevada and supporting other prediction markets in actions against state regulators in Massachusetts, Ohio, Tennessee, Michigan, New York, and Utah. Brief for CFTC as Amicus Curiae Supporting Plaintiff, *N. Am. Derivatives Exch. Inc. v. Nevada.*, No. 25-7187 (9th Cir. Feb. 17, 2026), ECF No. 38; Brief for CFTC as Amicus Curiae Supporting Appellant, *Commonwealth of Mass. v. KalshiEx LLC*, No. SJC-13906 (Mass. Apr. 24, 2026), ECF No. 38; Brief for CFTC as Amicus Curiae Supporting Plaintiff-Appellant, *KalshiEx, LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), ECF No. 31; Brief for CFTC as Amicus Curiae Supporting Plaintiff-Appellant, *KalshiEX, LLC v. Orgel*, No. 26-5235 (6th Cir. June 24, 2026), ECF No. 63; Brief for CFTC as Amicus Curiae Supporting Plaintiff-Appellant, *QCX LLC d/b/a Polymarket US v. Nessel*, No. 26-1552 (6th Cir. Aug. 24, 2026), ECF No. 20; Brief for CFTC as Amicus Curiae Supporting Plaintiff-Appellant, *KalshiEX LLC v. Williams*, No. 26-1835 (2d Cir. Sep. 8, 2026), ECF No. 51; Brief for CFTC as Amicus Curiae Supporting Plaintiff-Appellant, *KalshiEX LLC v. Cox*, No. 26-4100 (10th Cir. Sep. 28, 2026), ECF No. 34.

62. In addition, the CFTC has issued several Notices of Proposed Rulemaking Relating to Prediction Markets. The CFTC issued Release No. 9194-26 (Mar. 12, 2026) along with a Prediction Markets Advisory (CFTC Letter No. 26-08) explaining that event contracts are "swaps" under the CEA.

63. In June, the CFTC issued a Notice of Proposed Rulemaking seeking public comment on a proposed amendment to Regulation 40.11 (17 C.F.R. § 40.11) to clarify the public interest determination framework pursuant to the Special Rule. *Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806 (CFTC June 12, 2026) (to be codified at 17 C.F.R. pt. 40). First, the Release makes clear that sports event contracts involve "gaming" under the Special Rule. *See generally id*. Second, it clarifies that the CFTC has never interpreted the Special Rule as a "*per se* prohibition" of event contracts involving activities enumerated in the Special Rule, such as gaming. *Id.* at 35,815. Third, it establishes a framework to determine "when event contracts involving sports events are not contrary to the public interest." *Id.* at 35,869-35,870. Fourth, the CFTC preliminary concludes that sports event contracts are not contrary to the public interest. *Id.* at 35,836, 35,853. Finally, it discusses how sports event contracts "can serve as price discovery tools by indicating what the market or the general public thinks about the underlying events or issues (i.e., market sentiment)." *Id.* at 35,865.

64. On October 9, 2026, exercising its authority to "further define" the term "swap," 15 U.S.C. § 8302(d)(1), the CFTC proposed a rule providing that the term "swap" includes "[e]vent contracts, including those based on sports-, politics-, cultural-, and weather-related events." *Further Definition of "Swap"—Inclusions*, RIN 3038-AF82, at 66023 (CFTC Oct. 9, 2026) (Notice of Proposed Rulemaking). As the CFTC explained, "[f]or decades, the CFTC's position has been that event contracts are derivatives subject to its jurisdiction" and "the best reading of the statute" is that event contracts based on sporting events "qualify as swaps." *Id.* at 66025-26.

65. The same day, the CFTC issued an Interim Final Rule—which is now in effect—that excludes from the definition of swap "[c]asino-style gambling products," i.e., wagers accepted

by a state- or tribal-licensed gaming operator "acting within the scope of that license" that are "not traded on a board of trade, an organized exchange, a swap execution facility, or any other market in which trades are executed multilaterally." *Further Definition of "Swap" to Exclude Casino-Style Gambling Products*, RIN 3038-AF81, 65,979 (CFTC Oct. 9, 2026). That interim final rule was published on October 19, 2026, and is now in effect. 91 Fed. Reg. 65,969 (Oct. 19, 2026) (to be codified at 17 C.F.R. pt. 1) (Interim Final Rule) (hereinafter "Exclusion IFR").

66. The CFTC explained that gambling products "are typically conducted as bilateral transactions between a casino or bookkeeper (a 'house') and its customer rather than on an organized market," at prices "unilaterally dictated by the casino or sportsbook." *Id.* at 65,972-65,973. Gambling products use prices that "are not set by market forces and are not subject to negotiation; rather, customers must accept the price set by the house." *Id.* And they "are not inherently *tradable*" distinguishing them from "derivative[s] within the Commission's jurisdiction." *Id.* at 65,973 (emphasis in original).

67. On the other hand, event contracts "are traded on CFTC-registered national exchanges at market-set prices through the interaction of bids or offers placed on a central orderbook, not at prices unilaterally dictated by a 'house,'" on exchanges that "are neutral" and "do not profit when the event contract settles one way versus another," and "are centrally cleared by CFTC-registered clearinghouses to eliminate counterparty credit risk, just like other derivatives transactions." *Id.* at 65,973-65,974. The rule includes contracts "entered into on a trading facility, including a DCM" in the definition of swap, because these contracts' "price and other economic terms would be determined through the competitive interaction of multiple buyers and sellers on a multilateral basis." *Id.* at 65,975.

68. Thus, the rule corrects the "erroneous premise that if event contracts are swaps, then casino-style gambling products must also be swaps," *id.* at 65,971, and confirms that "while gambling is traditionally state-regulated, event contracts are traditionally federally regulated," *id.* at 65,974. The Exclusion IFR was expressly issued to combat "state-level actions"—such as the action threatened by Arkansas here—that "imperil a nascent industry that Congress has entrusted to the 'exclusive jurisdiction' of a federal agency, the CFTC." *Id.* at 65,977.

69. The CFTC also reaffirmed its position that a patchwork of differing state regulations would make it impossible for DCMs like OG.com to comply with CEA Core Principles. For example, on August 11, 2026, the CFTC issued an emergency order directing Kalshi and its affiliates to continue to perform their functions as exchanges in response to New York's ongoing enforcement action against Kalshi.[11] The CFTC emphasized that compliance with New York's proposed temporary restraining order, if granted, would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" New York CFTC Order at 8-9 (citing 7 U.S.C. § 7(d)(4), (d)(9)).

70. Additionally, on July 12, 2026, in response to a state court decision ordering Kalshi to "void[], cancel[], and refund[]" trades entered into by Kalshi traders located in Michigan, Kalshi notified the CFTC that it would "force-liquidate the open positions of specific users identified and

---

[11] Order Directing Kalshi to Continue Exercising DCM Functions at 9, *In the Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration*, CFTC (Aug. 11, 2026), https://www.cftc.gov/media/14471/OGC_MarketEmergencyDeclarationOrder081126/download (hereinafter, "New York CFTC Order").

directed by the Court."[12] In response, on July 14, 2026, the CFTC issued an Order directing Kalshi to "fulfill the open trades in question as it would in the ordinary course of business." CFTC Michigan Order at 9. The CFTC found that the "unprecedented order requiring Kalshi to unwind open, previously executed trades" constitutes a "'major market disturbance which prevents the market from accurately reflecting the forces of supply and demand' with respect to event contracts." *Id.* at 6-7. Most significantly, the CFTC wrote that "forced liquidation of trades will cause distortions" which "would, among other things, violate CEA Core Principle 4, which requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process." *Id.* at 8. This directive applies with equal force here and nationwide.

71. Most recently, on November 5, 2026, the CFTC issued an interpretation of the impartial access requirement pursuant to Core Principle 2 of the CEA. *DCM Impartial Access Interpretive Guidance*, 17 CFR Part 38, Release Number 9323-26 (CFTC Nov. 5, 2026). The interpretive guidance makes clear that restricting access to certain event contract markets based on prospective traders' location or residence violates the CEA. *Id.* at 4-5. The CFTC directed that DCMs must "cease domestic geographic restrictions that violate the Impartial Access Requirements within 30 days or else submit to the Division of Market Oversight ("Division") an explanation for why such compliance is not feasible." Press Release, CFTC, CFTC Issues Impartial Access Requirements Interpretation (Nov. 5, 2026) https://www.cftc.gov/PressRoom/PressReleases/9323-26.

---

[12] CFTC Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents, *In re Matter of KalshiEX LLC's Notice Regarding Mkt. Emergency Declaration & Emergency Rule Filing Pursuant to Comm'n Reg. 40.6(a)*, CFTC (July 14, 2026), https://www.cftc.gov/filings/documents/2026/orgcftcorderstaying kalem61407.pdf (hereinafter, "CFTC Michigan Order").

**F. Arkansas Has an Extensive Regime for Regulating Sports Wagering**

72. In the State of Arkansas, "gambling largely remains illegal." Kalshi Compl. ¶ 47. Arkansas state law forbids "keeping, conducting, or operating any gambling house or place where gambling is carried on" and "setting up, keeping, or exhibiting any gambling device," Ark. Code Ann. §§ 5-66-103, except as the Arkansas Constitution itself provides, Ark. Const. amend. 100, §§ 1-4, and the Criminal Code makes unauthorized gambling a crime, Ark. Code Ann. §§ 5-66-103, 5-66-104, 5-66-106.

73. In 2018, Arkansas voters amended the state constitution to authorize casino gaming and sports wagering in limited circumstances. Ark. Const. amend. 100. §§ 1-4. Casino gaming "is defined as dealing, operating, carrying on, conducting, maintaining, or exposing for play any game played with cards, dice, equipment, or any mechanical, electromechanical, or electronic device or machine for money, property, checks, credit, or any representative value" and includes "accepting wagers on sporting events." Ark. Const. amend. 100, § 2(c).

74. More specifically, a "sports pool" is "a business that accepts wagers on sporting events other than horse or other animal races." 23 Ark. Code R. § 358-2001 (20). An "[o]nline sports pool" is "an operation in which wagers on sports events are made over the internet on websites or mobile applications through computers, mobile devices, or other approved interactive devices accepted through a gaming system approved by the Arkansas Racing Commission." 23 Ark. Code R. § 358-2001 (12)(a).

75. Pursuant to Amendment 100, the Arkansas Racing & Gaming Commission ("ARC") licenses and regulates gaming in Arkansas. Ark. Const. amend. 100, § 4. ARC "administer[s] and regulate[s] casino licenses, including their issuance and renewal" and "enforce[s] the provisions of this Amendment relating to all casino licensees." Ark. Const. amend.

100, § 4(a). ARC has the power to "adopt rules necessary to carry out the purposes of this Amendment and perform its duties," Ark. Const. amend. 100, § 4(c), and has used this authority to adopt such rules, *see* 23 Ark. Code R. §§ 358-2001-358-2031.

76. Under Arkansas state law, "[n]o person may operate or own any interest in a race book or sports pool in Arkansas unless that person holds a casino license." 23 Ark. Code R. § 358-2002(a). However, the Arkansas Constitution only permits three casino licenses across three counties. Ark. Const. amend. 100, § 4(j), (k), (s). All three licenses have been awarded,[13] and no others are available under the law.

77. Only with approval from ARC, can a casino licensee provide an "online sports platform." 23 Ark. Code R. § 358-2002(d). As the State itself asserts, "[t]o obtain and maintain authorization to conduct sports wagering in Arkansas, operators must satisfy extensive licensing, suitability, integrity, auditing, and compliance requirements imposed by statute and regulation." Kalshi Compl. ¶ 40.

78. Such extensive requirements include that licensees' internal control systems are subject to ARC oversight and approval. 23 Ark. Code R. § 358-2002(c); 23 Ark. Code R. §§ 358-601 et seq. Further, licensees can only accept sports wagers "through an account wagering system that has been approved" by ARC. 23 Ark. Code R. § 358-2007(2). Critically, licensees may only accept "wagers on sporting events" when "the person is physically present in the State of Arkansas when placing the wager." 23 Ark. Code R. § 358-2006(a).

---

[13] *See* Josie Lenora, *Cherokee Nation awarded Pope County casino license*, Little Rock Public Radio, June 27, 2024, https://www.ualrpublicradio.org/local-regional-news/2024-06-27/cherokee-nation-awarded-pope-county-casino-license; Ark. Dep't of Fin. & Admin., *Frequently Asked Questions*, https://www.dfa.arkansas.gov/wp-content/uploads/FAQ_Casino_Gaming.pdf

79. Annually, Arkansas also imposes a 13% tax on the first $150,000,000 of a licensee's net-casino gaming receipts and a 20% tax on net-casino receipts exceeding $150,000,001. Ark. Const. amend. 100, § 5(a).

80. Arkansas also criminalizes unlawful gambling. "A person commits the offense of keeping a gambling house" by (1) "keeping, conducting, or operating" a "place where gambling is carried on"; (2) "setting up, keeping, or exhibiting any gambling device"; or (3) "furnish[es] money or another article, for the purpose of carrying on any gambling house." Ark. Code Ann. § 5-66-103. This is a class D felony. *Id.* It is also unlawful for a person to "set up, keep, or exhibit any gaming table or gambling device" at which "any money or property may be won or lost" and a violator may be subject to fines and imprisonment. Ark. Code Ann. § 5-66-104; *see also* Ark. Code Ann. § 5-66-105.

### G. The State Attorney General Seeks to Impose Preempted State Law on Federally Regulated Contract Markets

81. On November 4, 2026, Defendant Griffin, in his official capacity as the State Attorney General, filed a civil enforcement action in the Circuit Court of Independence County, Arkansas Civil Division, against Kalshi and certain of its affiliates, asserting that federally regulated event contracts violate Arkansas' gambling laws and "Kalshi's sports-event contracts constitute 'casino gaming' and Kalshi operates a 'sports pool' under Arkansas law by accepting wagers on sporting events." *See* Kalshi Compl. ¶ 86; *see also id.* ¶¶ 7, 28-49, 69-94.

82. The State Attorney General asserts claims against Kalshi for three violations of the Arkansas Deceptive Trade Practices Act ("ADTPA") and a common law claim for unjust enrichment. *Id.* ¶¶ 162-211. The State Attorney General claims that a "legal violation committed in the course of a consumer transaction is a *per se* violation of the ADTPA's unconscionability clause" and "Kalshi has engaged in unconscionable practices through its unauthorized offering and

facilitation of wagering in Arkansas," in violation of ADTPA. *Id.* ¶¶ 186-188; Ark. Code Ann. § 4-88-107(a)(10). Further, the State Attorney General claims that Kalshi violated the ADTPA by "deceptively omitt[ing] and conceal[ing] the material fact that wagers offered on its website are illegal in Arkansas with the intent that persons in Arkansas would rely on the omission and concealment of that fact." Kalshi Compl. ¶¶ 196-200; Ark. Code Ann. § 4-88-108(a)(1). The Complaint seeks declaratory relief that Kalshi violated the ADTPA; a permanent injunction enjoining Kalshi from "engaging in acts and practices alleged in this Complaint and any other acts and practices that violate the ADTPA"; an order directing Kalshi to restore any monies to "any purchaser who has suffered any ascertainable loss by reason of the use or employment of the prohibited practices"; restitution pursuant to Ark. Code Ann. § 4-88-104; restitution in the sum by which Kalshi has been unjustly enriched; actual and compensatory damages; and the maximum civil penalties in accordance with Ark. Code Ann. § 4-88-113(a)(3) and § 4-88-202. Kalshi Compl. ¶ 213.

83. The State Attorney General's press release announcing the Kalshi Enforcement Action claimed that Kalshi's business, which "it calls a prediction market," amounts to "gambling on an unregulated platform [which] is squarely prohibited by Arkansas law." Office of the Arkansas Attorney General, *Attorney General Griffin Sues Prediction Market Kalshi for Providing Illegal Gambling Platform in Arkansas*, (November 4, 2026), https://arkansasag.gov/news-release/attorney-general-griffin-sues-prediction-market-kalshi-for-providing-illegal-gambling-platform-in-arkansas/. The State Attorney General alleged that Kalshi violated gambling laws by not "obtaining the licenses, submitting to the oversight, complying with the restrictions, and paying the taxes required of lawful gambling operators in Arkansas" and the lawsuit is intended to "hold Kalshi accountable for multiple violations of the Arkansas Deceptive Trade Practices Act." *Id.*

84. The Kalshi Enforcement Action was preceded by a significant amount of advocacy by state officials in Arkansas against federally regulated markets. For example, Arkansas has jointly filed amicus briefs with other states in the Second, Third, Fourth, Sixth, Seventh, Ninth, and Tenth Circuits, the Supreme Judicial Court of Massachusetts, and the Supreme Court of the United States, taking the position that states have the authority to prohibit federally authorized event contracts as contrary to state gambling laws. *See* Brief of Amici Curiae Ohio, Nevada, 35 Other States, the District of Columbia, and the Northern Mariana Islands Supporting Appellees, *KalshiEX LLC v. Williams*, No. 26-1835 (2d Cir. Nov. 6, 2026), ECF No. 91.1; Brief of Amici Curiae of Nevada, Ohio, 32 Other States, District of Columbia, and Northern Mariana Islands Supporting Appellants, *KalshiEx LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), ECF No. 29; Brief of Amici Curiae of Nevada, Ohio, 36 Other States, and the District of Columbia Supporting Appellees, *KalshiEx LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), ECF No. 41-1; Brief of Amici Curiae of Nevada, Ohio, 36 Other States, and the District of Columbia Supporting Appellees, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. June 11, 2026), ECF No. 57; Brief of Amici Curiae Ohio, Nevada, 36 Other States, the District of Columbia, and the Northern Mariana Islands Supporting State Defendants, *USA v. Wisconsin*, No. 26-2636 (7th Cir. Nov. 4, 2026), ECF No. 62; Brief of Amici Curiae of Ohio, New Jersey, 37 Other States, and the District of Columbia Supporting Appellees, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Mar. 10, 2026), ECF No. 76.1; Brief of Amici Curiae of Ohio, New Jersey, 37 Other States, and the District of Columbia Supporting Appellees, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7831 (9th Cir. Mar. 10, 2026), ECF No. 81.1; Brief of Amici Curiae of Ohio, New Jersey, 37 Other States, and the District of Columbia Supporting Appellees, *KalshiEX LLC v. Assad*, No. 25-7516 (9th Cir. Jan. 30, 2026), ECF No. 48.1; Brief of Amici Curiae Ohio, Nevada,

35 Other States, the District of Columbia, and the Northern Mariana Islands Supporting Appellees, *KalshiEX LLC v. Cox*, No. 26-4100 (10th Cir. Oct. 29, 2026), ECF No. 62; Brief of Amici Curiae of Nevada, Ohio, 35 Other States, and the District of Columbia, *Commonwealth v. KalshiEX LLC*, No. SJC-13906 (Mass. Apr. 24, 2026) ECF No. 37; Brief of Amici Curiae Ohio, 38 Other States, and the District of Columbia in Support of Petitioners, *Flaherty v. KalshiEx, LLC*, No. 26-299 (U.S. Oct. 7, 2026).

85. Further, on July 27, 2026, the State Attorney General signed onto a letter to the CFTC on behalf of multiple states, providing comment on the CFTC's proposed rule providing that the term "swap" includes event contracts, *see supra* ¶¶ 62-65, claiming that "the CFTC lacks statutory authority for its Proposed Rule" by "permit[ting] sports betting on prediction markets." Letter from Ohio, Kentucky, Maryland, Nevada, New Jersey, New York, Tennessee, Utah, and 36 Other States to Christopher Kirkpatrick Secretary, Commodity Futures Trading Commission (July 27, 2026), https://business.cch.com/srd/20260726_State_AGs_letter_ CFTC_prediction_markets 072926.pdf.

86. In light of the civil enforcement action commenced by the State Attorney General against Kalshi, Defendants' roles in enforcing Arkansas gaming laws, Arkansas' coordinated advocacy in support of state regulators in other cases, and public statements by Defendants evincing an intent to enforce preempted state laws against prediction markets, there is a concrete and imminent threat that Defendants will file an enforcement action against OG.com as they did against Kalshi. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'") (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

## H. Defendants' Threatened Enforcement Against OG.com Will Imminently and Irreparably Harm OG.com and Interfere with Its Ability to Conduct Federally Regulated Activities

87. OG.com's rulebook sets forth over 50 different event contracts, all of which are subject to federal regulation pursuant to the process described above.

88. OG.com permits event contracts to be purchased and sold by residents of Arkansas and other states and territories.

89. As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject OG.com and its customers to irreparable harm. Being subject to an unlawful state enforcement action would cause OG.com irreparable injury, both in economic terms and in terms of being restrained from lawful activity without any monetary recourse.

90. Under Defendants' interpretation of Arkansas law, OG.com could not offer online access to its federal derivatives market to persons "in the State of Arkansas." 23 Ark. Code R. § 358-2006(a); 23 Ark. Code R. § 358-2002.

91. Ceasing to permit Arkansas residents to purchase or sell event contracts on OG.com's DCM in order to avoid civil penalties or criminal sanctions pursued by Defendants would deprive OG.com of the revenue that it would otherwise derive from trading of event contracts by Arkansas residents. These ongoing economic losses would be unrecoverable because sovereign immunity bars recovery for monetary damages. *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999). Damages that are unrecoverable due to sovereign immunity constitute irreparable harm. *See Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899-900 (8th Cir. 2000) (the "importance of preliminary injunctive relief is heightened" where "[r]elief in the form of money damages could well be barred by [the State's] sovereign immunity"); *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d

1466, 1473 (8th Cir. 1994) (economic harm irreparable where the plaintiff "would be unable to recover any damages" because the state agency has "sovereign immunity in federal court in suits requesting money damages"); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (although "the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped'" (citation omitted)); *see also Bank One, Utah v. Guttau*, 190 F.3d 844, 851 (8th Cir. 1999) ("continued enforcement" of a state statute preempted by federal law "would result in irreparable economic loss" to the regulated party).

92. Moreover, the potential loss of OG.com's reputation and goodwill is incalculable and thus an irreparable injury. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."); *Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789-90 (8th Cir. 2010) (loss of goodwill from operating under an unlawful ordinance irreparable where lost customers "would be unlikely to return once the Ordinance's restrictions are lifted").

93. If OG.com were to cease permitting Arkansas residents to purchase or sell event contracts on its DCM to avoid an enforcement action, it would also suffer competitive injury by losing the ability to compete as a market for event contracts against other federally registered DCMs operating in the state.

94. OG.com could not avoid irreparable harm by ceasing to offer event contracts in Arkansas. It would be entirely impracticable for OG.com to subject itself to the often conflicting regulations of each of the states in which it offers federally regulated event contracts for trading. Accepting such jurisdiction would subject OG.com to the very patchwork of state regulation (including prohibitions as here, regulations, reporting obligations, registration costs, and other rules) that Congress expressly preempted under the CEA. Different states have taken different

approaches to regulation of online gambling. Many states permit online gambling, subject to state-level regulation. Others, such as Utah, prohibit it entirely. It would be impossible for OG.com to both offer "impartial access" to its DCM as required by 17 C.F.R. § 38.151(b) and simultaneously comply with state gaming laws in 50 states.

95. The threat of attempted enforcement alone presents OG.com with the Hobson's choice between (1) subjecting itself to potential penalties brought by the State Attorney General, with all the expenditures and reputational damage that entails, and (2) ensuring compliance with the authority the State Attorney General has asserted, which would require OG.com to cease offering any event contracts to anyone in Arkansas and closing open contracts. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding injunctive relief available where imminent enforcement actions created such a Hobson's choice leaving party with no adequate remedy at law). This latter choice also conflicts with OG.com's obligations as a federally registered DCM.

96. The State Attorney General's proposed ban on event contracts would violate the CFTC's Core Principles to the extent OG.com would have to disrupt open contracts. This conflict is not hypothetical—the exact issue has reached a tipping point in New York and Michigan. The CFTC stated that New York's proposed temporary restraining order against Kalshi would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" New York CFTC Order at 8-9 (citing 7 U.S.C. § 7(d)(4), (d)(9)). The CFTC's Michigan Order directed Kalshi to "fulfill the open trades in question as it would in the ordinary course of business" despite a state court order to "force-

liquidate the open positions" of Michigan residents. CFTC Michigan Order at 3, 9. The CFTC found that compliance with the state court order would cause price and market distortions in violation of CEA Core Principle 4, "which requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process." *Id.* at 8. Here, OG.com's compliance with Arkansas's gambling laws would cause OG.com to violate the CFTC's Core Principles and risk its certification as a DCM.

97. If OG.com were to cease offering event contracts and close open contracts in Arkansas to avoid an enforcement action, OG.com would be subjected to a regulatory regime directly in conflict with CFTC regulations, including its Core Principles, and the very concept of a registered DCM. OG.com's federal derivatives market would be deprived of nationwide liquidity on which it depends.

98. Inaction in the face of Defendants' likely assertion of authority to regulate DCMs would threaten the future of OG.com's business in Arkansas. An actual and substantial controversy exists between OG.com and Defendants as to their respective legal rights and duties. The imminent threat of an enforcement action against OG.com will result in irreparable injury to OG.com, including, but not limited to, criminal liability, civil liability, economic hardship, and impairment of existing contractual relationships.

99. OG.com has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Moreover, because monetary damages are generally not available in suits against state government agencies, OG.com likely would be left without a remedy in the absence of prospective relief.

100. OG.com therefore brings this action to seek declaratory and injunctive relief restraining Defendants from enforcing Arkansas law that interferes with the operation and function of OG.com's market described herein.

**COUNT I**

**(Express Preemption—Against All Defendants)**

101. Plaintiff incorporates all prior paragraphs by reference.

102. Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

103. An actual controversy exists between OG.com, on the one hand, and the Defendants, on the other, regarding whether Defendants have legal authority to regulate the trading of OG.com's event contracts.

104. For the reasons described above, without regard to whether Defendants have correctly interpreted Arkansas law, OG.com is authorized to list and offer event contracts to Arkansas residents (and residents of each of the other states and territories of the United States) pursuant to the CEA. Whether trading in particular sports event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A).

105. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Arkansas law, Arkansas law is preempted pursuant to the Supremacy Clause, which provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
>
> U.S. Const., art. VI, cl. 2.

106. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly reserved exclusive authority to the federal government.

107. The CEA's express preemption of state laws purporting to regulate trading on federally regulated derivatives markets or otherwise under the oversight of the CFTC could not be more clear. Congress gave the CFTC "exclusive jurisdiction" to regulate derivatives trading on approved exchanges for on-exchange trading. 7 U.S.C. § 2(a)(1)(A). Without a unified approach to derivatives regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos." Senate Hearings, 93rd Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Congress punctuated the importance of preemption of state law by ensuring federal law supersedes and preempts state gaming law as applied to financial instruments the CFTC exempted from the registered exchange requirement. *See* 7 U.S.C. § 16(e)(2). Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in derivatives trading on CFTC-regulated exchanges. *See, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026); *United States & CFTC v. Illinois*, No. 1:26-cv-03659, 2026 WL 2969682, at *6-11 (N.D. Ill. Oct. 2, 2026); *United States & CFTC v. Minnesota*, No. 26-cv-2661, 2026 WL 2150211, at *13 (D. Minn. July 27, 2026); Order at 2-3, *KalshiEX, LLC v. Johnson*, No. 2:26-cv-01715 (D. Ariz. Apr. 10, 2026), ECF No. 65; *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992); *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

108. Defendants may therefore not attempt to enforce Arkansas's gambling laws against OG.com—including, but not limited to, Ark. Const. amend. 100, §§ 1-4; Ark. Code Ann. §§ 5-66-

103, 5-66-104, 5-66-106; 23 Ark. Code R. §§ 358-2001-2031, and any rules or regulations adopted thereunder—because OG.com is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

**COUNT II**

**(Field Preemption—Against All Defendants)**

109. Plaintiff incorporates all prior paragraphs by reference.

110. Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

111. An actual controversy exists between OG.com, on the one hand, and the Defendants, on the other, regarding whether Defendants have legal authority to regulate the trading of OG.com's event contracts.

112. By threatening to enforce the statutes *supra* ¶ 108 or any other statutes, and any rules adopted thereunder, against OG.com, Defendants are impermissibly intruding on the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

113. For the reasons described above, without regard to whether Defendants have correctly interpreted Arkansas law, OG.com is authorized to list and offer event contracts to Arkansas residents (and residents of each of the other states and territories of the United States) pursuant to the CEA. Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.

114. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Arkansas law, Arkansas law is preempted pursuant to the Supremacy Clause.

115. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has adopted a comprehensive regulatory scheme, thus occupying the field for regulation.

116. Through the CEA and its amendments, Congress has adopted a comprehensive regulatory scheme regulating derivatives trading on regulated markets, including the trading of event contracts. *See* 7 U.S.C. §§ 1 *et seq.* That scheme includes creating the CFTC and vesting it with exclusive authority to regulate derivatives trading.

117. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same subject matter. Because federal law occupies the entire field of regulating derivatives trading on regulated markets, the threatened actions are field-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 228.

118. Defendants therefore may not attempt to enforce Arkansas's gambling laws against OG.com because OG.com is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## COUNT III

### (Conflict Preemption—Against All Defendants)

119. Plaintiff incorporates all prior paragraphs by reference.

120. Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

121. An actual controversy exists between OG.com, on the one hand, and the Defendants, on the other, regarding whether Defendants have legal authority to regulate the trading of OG.com's event contracts.

122. By threatening to enforce the statutes *supra* ¶ 108 or any other statutes, and any rules adopted thereunder, against OG.com, Defendants are impermissibly intruding on the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

123. For the reasons described above, without regard to whether Defendants have correctly interpreted Arkansas law, OG.com is authorized to list and offer event contracts to Arkansas residents (and residents of each of the other states and territories of the United States) pursuant to the CEA. Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.

124. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder conflict with Arkansas law, Arkansas law is preempted pursuant to the Supremacy Clause.

125. The Supremacy Clause mandates that federal law preempts state law where compliance with the state law would conflict with federal law.

126. Defendants likewise threatened to deploy Arkansas law against OG.com in a manner that conflicts with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized, which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. For that reason, among others, the threatened actions are conflict-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 228.

127. Defendants therefore may not attempt to enforce Arkansas's gaming laws against OG.com because OG.com is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff OG.com requests that judgment be entered in its favor and against Defendants as follows:

1. That this Court enter a judgment declaring that the challenged provisions, or any other state laws pertaining to gambling, fringe gambling, or online gambling, as applied to OG.com, violate the Supremacy Clause and are therefore preempted, unconstitutional, and invalid;

2. That this Court issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees, from enforcing the challenged provisions or any other state laws pertaining to gambling or wagering, as applied to OG.com;

3. Award such other relief within this Court's discretion that it deems just and proper.

Dated: 9th day of November, 2026.

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

David F. Koehler, Ark. Bar No. 2014238
320 South Canal Street
Chicago, IL 60606
Telephone: (312) 407-0876
Facsimile: (312) 827-9386
david.koehler@skadden.com

David Meister (*pro hac vice* forthcoming)
Robert A. Fumerton (*pro hac vice* forthcoming)
Judith A. Flumenbaum (*pro hac vice* forthcoming)
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
david.meister@skadden.com
robert.fumerton@skadden.com
judy.flumenbaum@skadden.com

Shay Dvoretzky (*pro hac vice* forthcoming)
Parker Rider-Longmaid (*pro hac vice* forthcoming)
Sylvia O. Tsakos (*pro hac vice* forthcoming)
1440 New York Avenue NW
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
shay.dvoretzky@skadden.com
parker.rider-longmaid@skadden.com
sylvia.tsakos@skadden.com

*Attorneys for North American Derivatives Exchange, Inc., d/b/a OG.com Prediction Markets*

# EXHIBIT A

crypto.com DERIVATIVES NORTH AMERICA

January 30, 2025

Via CFTC Portal Submissions

Mr. Christopher Kirkpatrick
Secretary of the Commission
Office of the Secretariat
Commodity Futures Trading Commission
3 Lafayette Centre
1155 21st Street, N.W.
Washington D.C. 20581

**RE: Certification of Contingent Derivatives Contract (Industry Event - Live Presentations - NAICS 711) - Submission Pursuant to Commission Regulation 40.2(a)**

Dear Mr. Kirkpatrick:

Pursuant to Section 5c(c)(1) of the Commodity Exchange Act, as amended (the "Act" or "CEA"), and §40.2(a) of the regulations promulgated by the Commodity Futures Trading Commission (the "Commission") under the Act, the North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America (the "Exchange" or "CDNA") hereby certifies a contingent derivatives contract that is a tradeable financial instrument (*i.e.* a swap) based on an event in the live presentations industry (the "Event Contract" or "Contract"). The Exchange intends to list the Event Contract for trading no later than February 3, 2025.

In connection with this certification, CDNA is submitting the following:

- (i) A concise explanation and analysis of the Event Contract;
- (ii) A certification that the Event Contract complies with the Act and Commission Regulations thereunder;
- (iii) A certification that CDNA has posted a copy of the product submission on its website;
- (iv) The intended listing date of the Event Contract;
- (v) The terms and conditions of the Event Contract, set forth in Exhibit A hereto; and
- (vi) A discussion of the Event Contract's compliance with applicable provisions of the Act and Commission Regulations thereunder, set forth in Exhibit B hereto.

The Event Contract is a contingent derivatives contract that is a tradeable financial instrument designed to express a market view related to the broad and varying economic and commercial impacts of the outcome of an event in the live presentations industry. Separate, discrete and identifiable live presentation industry events (each an "Industry Event") not only have an outcome that determines a leader, an achievement, an accomplishment, a champion, a title holder or a winner of a particular live presentation industry event, but more importantly the outcome of a live presentation industry event has a substantial economic and commercial impact on businesses and individuals throughout America depending on many factors.[1] CDNA designed the Event Contract to meet the varied and diverse hedging and market needs of commercial firms and individuals impacted by or with an economic interest in the Industry Event outcome. The Event Contract is traded in the centralized market of the Exchange where bids and offers are matched first by price and then time priority. There is no intervention in the trading process by the Exchange. Rather, the Event Contract trades in a competitive, open, and efficient market and mechanism for executing transactions. The trading provides a market for the price and information discovery process related to market sentiment on the outcome of the Industry Event.

The Event Contract operates in a manner equivalent to economic event contracts that CDNA and other designated contract markets have certified for trading.[2] Price bands will apply so that the Contract may only be listed at increments of at least $0.25 and at most $99.75. The Contract has a notional value of $100 and a minimum price fluctuation of $0.25 to align with other CDNA contracts.

As outlined in Exchange Rule 5.18, trading will be available at all times outside of any maintenance windows and as set forth in the Trading System, which CDNA will announce in advance. At least one dedicated market maker that is committed to providing immediate liquidity will participate upon the Event Contract's launch. CDNA has further imposed position limits as described in more detail below. Members will be charged fees in accordance with Exchange Rule 3.9 in such amounts as may be revised from time to time and reflected on CDNA's website.

During the Event Contract trading hours, Members are able to adjust their positions and trade freely. After trading of the Event Contract has closed, CDNA will determine the Expiration Value and whether the Payment Criteria encompasses the Expiration Value (i.e., whether the market outcome is "Yes" or "No"). The market is then settled by CDNA, and either the long position

---

[1] The U.S. The Bureau of Labor Statistics maintains data for over 100 industries and uses the North American Industry Classification System (NAICS) for supersectors, sectors, and industries to categorize the data. The Event Contract encompasses Industry Events in the industry categorized under NAICS 711 (Performing Arts, Spectator Sports, and Related Industries). *See* https://www.bls.gov/iag/tgs/iag711.htm.

[2] *See e.g.*, Rule Certification: Nadex Lists New Event Binary Contracts – Submission Pursuant to Commission Regulation §40.2(a), Nov. 26. 2021, available at: https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/47219.

holders or the short position holders are paid the Settlement Value. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Event Contract and "short position holders" refers to Members who purchased the "No" side of the Event Contract. If the Expiration Value is "Yes" (please see Exhibit A for the conditions upon which the Expiration Value is "Yes"), then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Expiration Value is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger an Expiration Value of "Yes" are included below in the section titled "Payment Criterion" in Exhibit A. The Expiration Date of the Contract is designed to account for multiple possible contingencies regarding the timing of the determination of the event.

In accordance with §40.2(a)(2) of the Commission's Regulations and as set forth above, the Exchange intends to list the Event Contract for trading no later than February 3, 2025.

The contract specifications as they will appear in the CDNA Rulebook are set forth in Exhibit A. A complete index of the Core Principles for designated contract markets, which addresses each applicable Core Principle, is set forth in Exhibit B.

The Exchange hereby certifies that the product complies with the Act, as amended, and the Commission Regulations adopted thereunder. No substantive opposing views were expressed to the Exchange with respect to any of these actions. The Exchange hereby certifies that a copy of this submission was concurrently posted on the CDNA website.

Should you have any questions regarding the above, please do not hesitate to contact me by telephone at (312) 884-0161 or by email at Kevin.Dan@nadex.com.

Sincerely,

/s/

Kevin Dan
Chief Compliance Officer and Chief Regulatory Officer
The North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America

**EXHIBIT A**

*The Contract Specifications set forth below will appear in the Rulebook as Rule 13.29. Capitalized terms not defined herein shall have the meaning set forth in the Rulebook.*

13.29 CONTINGENT DERIVATIVES CONTRACT - INDUSTRY EVENT - LIVE PRESENTATIONS - NAICS 711

(a) SCOPE – These Rules shall apply to the Class of Contracts referred to as the Contingent Derivatives Contract - Industry Event- Live Presentations - NAICS 711, a type of "Event Contract" listed by the Exchange.

(b) UNDERLYING – The Underlying for this Contract is a separate, discrete and identifiable industry event (the "Industry Event") that determines a leader, champion, title holder or winner for that specific Industry Event that occurs on a specific Date.

(i) Industry Event: refers to any separate, discrete and identifiable live presentation industry event in Performing Arts, Spectator Sports, and Related Industries[3] where the outcome identifies a leader, an achievement, an accomplishment, a champion, a title holder or a winner (the "Industry Event Holder") from the eligible participants in the Industry Event (the "Industry Participants").

(ii) Date: refers to the month, day and year in which the Industry Event takes place.

(c) SOURCE AGENCY – The Source Agency is the final result of the Industry Event reported by AP News or as a back-up Source Agency, any U.S. national news provider as published on the Trading System.

(d) TYPE – The Type of Contract is a contingent derivatives contract (i.e. an Event Contract), which is a Swap.

(e) PAYMENT CRITERION – The Payment Criterion for the Event Contract encompasses the Expiration Value where the Industry Event Holder is determined by the outcome of the Industry Event, as published by the Source Agency on the Expiration Date. Industry Event Holder will have the value set forth on the Trading System.

(f) MINIMUM TICK – The Minimum Tick size for the Event Contract shall be $0.25.

---

[3] The U.S. The Bureau of Labor Statistics maintains data for over 100 industries and uses the North American Industry Classification System (NAICS) for supersectors, sectors, and industries to categorize the data. The Event Contract encompasses Industry Events in the industry categorized under NAICS 711 (Performing Arts, Spectator Sports, and Related Industries). See https://www.bls.gov/iag/tgs/iag711.htm.

(g) POSITION LIMIT – The Position Limit for the Event Contract shall be 2,500 Contracts, or as updated on the Exchange's website or Trading System.

(h) MARKET MAKER ALTERNATIVE POSITION LIMIT – The Position Limit for Market Makers shall be 250,000 Contracts, or as updated on the Exchange's website or Trading System.

(i) LAST TRADING DATE – The Last Trading Date is the same as the Expiration Date. The Last Trading Time is the same as the Expiration Time. No trading in the Event Contract shall occur after its Last Trading Date and Last Trading Time.

(j) SETTLEMENT DATE AND TIME – The Settlement Date and Time will be the same as the Last Trading Date and Last Trading Time.

(k) EXPIRATION DATE – The Expiration Date of the Event Contract will be the date on which the Industry Event is held. The Expiration Date will be adjusted if a potential Industry Event Holder is eliminated from being eligible to participate in the Industry Event.

(l) EXPIRATION TIME – The Expiration Time of the Event Contract will be the start time of the Industry Event. The Expiration Time will be adjusted if a potential Industry Event Holder is eliminated from being eligible to participate in the Industry Event.

(m) SETTLEMENT VALUE – The Settlement Value is the amount paid to the holder of the in-the-money Event Contract on the Settlement Date. The Settlement Value of an in-the-money Event Contract is $100.

(n) EXPIRATION VALUE – The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration Time.

(o) CONTINGENCIES – If the Source Agency does not actually announce the outcome on or before the Expiration Date due to a delay, postponement or otherwise in such release announcement by the Source Agency, the Settlement Date and Time, Expiration Date, and Expiration Time will be delayed until the Underlying outcome is released.

(p) TRADING PROHIBITIONS – Certain individuals are prohibited from trading the Event Contract. Those persons include:

- Current and former Industry Participant players, coaches, agents and staff.
- Paid employees and management of the Industry Participants.
- Owners of the Industry Participants.
- Household members and immediate family members (siblings, children, and parents) of any of the above.

(q) TEMPORARY MARKET SUSPENSIONS – The Event Contract market will be temporarily suspended beginning approximately 60 seconds prior to the official start time of any event that is used to determine the Industry Event Holder or as set forth in the Trading System.

CONFIDENTIAL TREATMENT REQUESTED BY CDNA PURSUANT TO 17 CFR 145

**EXHIBIT B**

**COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT AND COMMISSION REGULATIONS THEREUNDER**

**BACKGROUND**

In connection with CDNA's certification of the Economic and Commercial Event Contract (the "Event Contract"), below we set forth a concise explanation and an analysis of the swap's compliance with applicable provisions of the Act, including Core Principles, and the Commission's Regulations thereunder.

The Event Contract is a contingent derivatives contract that is a tradeable financial instrument designed to express a market view related to the broad and varying economic and commercial impacts of the outcome of an event in the live presentations industry events. Separate, discrete and identifiable live presentation industry events (each an "Industry Event") not only have an outcome that determines a leader, an achievement, an accomplishment, a champion, a title holder or a winner of a particular live presentation industry event, but more importantly the outcome of an live presentation industry event has a substantial economic and commercial impact on businesses and individuals throughout America depending on many factors.[4] CDNA designed the Event Contract to meet the varied and diverse hedging and market needs of commercial firms and individuals impacted by or with an economic interest in the Industry Event outcome. The Event Contract is traded in the centralized market of the Exchange where bids and offers are matched first by price and then time priority. There is no intervention in the trading process by the Exchange or any other market participant. Rather, the Event Contract trades in a competitive, open, and efficient market and mechanism for executing transactions. The trading provides a market for the price and information discovery process related to market sentiment on the outcome of the Industry Event.

A wide range of factors and developments, including but not limited to the following, shape the significant commercial impact of Industry Events:

1. which Industry Participant make it to an Industry Event;
2. which Industry Participant leader, title holder or winner of an Industry Event;
3. where the Industry Event is located;
4. the hometowns of Industry Participants that makes it to the Industry Event;

---

[4] The U.S. The Bureau of Labor Statistics maintains data for over 100 industries and uses the North American Industry Classification System (NAICS) for supersectors, sectors, and industries to categorize the data. The Event Contract encompasses Industry Events in the industry categorized under NAICS 711 (Performing Arts, Spectator Sports, and Related Industries). *See* https://www.bls.gov/iag/tgs/iag711.htm.

5. the decisions by businesses as to how much money to spend on Industry Event advertisements within and beyond the surrounding areas of where the Industry Event is held;
6. how many people are drawn to the Industry Event (in person, streamed over the Internet, or watching from a local restaurant or bar);
7. the hiring of part-time and full-time employees to support the Industry Event and ancillary and adjacent activities, including any applicable post-Industry Event parades and celebrations;
8. impacts on the production and sales of products and services advertised during the Industry Event;
9. impacts on the production and sales of ancillary and adjacent products and services that support the Industry Event (e.g. hotels, airlines, rental properties, car rentals, entertainment events, taxis and rideshares, tourism generally, food items including chicken wings, pizza, and beverages);
10. decisions by viewers and the public at-large on taking a market view related to the Industry Event;
11. the impact of all Industry Event participant sponsorships including visibility, future branding campaigns, and advertisement thereon; and
12. City, county, and state level tax receivables.

The Event Contract's commercial utility directly derives from the broad-based and diverse number of businesses and individuals that are economically impacted by Industry Event and the availability of a fully regulated approach to hedging against the commercial risks associated with uncertain outcomes.

The Event Contract is designed to manage the risk of a variety of market participants, whose businesses face economic consequences based on the outcome of a respective Industry Event, and to enable price discovery for related commercial enterprises. As set forth below, these market participants take on material economic risk based on the outcome of an Industry Event. As is the case with any financial derivatives contract, the Event Contract may also be bought and sold speculatively, which creates a robust and healthy market. The Event Contract may also meet other hedging and speculative needs and suit other purposes of market participants that CDNA has not considered.

Industry Events serve as a significant economic driver whose economic effects can be felt in infrastructure investments, transportation networks, and the global supply chain. With this in mind, the following is a sampling of just some of the market participants that would benefit from hedging their economic exposure on a federally-regulated derivatives exchange. These market participants encounter direct and quantifiable economic consequences when engaging in activities related to the outcome of the Industry Event, making the Industry Event, itself, a commercial event.

1. Vendors and Merchandisers

Vendors and merchandisers would benefit from the ability to hedge their risks associated with the uncertainty of supply chain and product demand. Vendors and merchandisers take on risk when deciding how to utilize services and distribute products for an event that a large percentage of Americans consume, as with other commercial products and services. Moreover, vendors and merchandisers may use an Industry Event to introduce promotional events where, if their forecasted result does not occur, the vendor or merchandiser may face a significant commercial impact.

2. Advertisers

Advertisers would benefit from hedging their investment in Industry Event ad campaigns. Advertisements can reach millions of dollars for a 30-second commercial spot and thus carry the risk to advertisers' return on investment if the commercial or branding does not perform as expected.

3. Local Municipality (Host Location)

Local municipalities would benefit from hedging the risk exposure they take on as Industry Event hosts. Industry Events have the potential to generate millions of dollars in local gross domestic product, and billions of dollars in overall economic impact. This economic benefit, however, is by no means guaranteed to be net positive. Moreover, local municipalities face exposure to risk from fan unrest and local property destruction following the outcome of an Industry Event, which necessitates increased financial resources for safety and emergency response. Local municipalities that host Industry Events would benefit from having the ability to hedge the risk associated with the outcome of an Industry Event that comes with a substantial up-front investment with indeterminate revenue outcomes and safety concerns.

4. Local Municipalities (Association Participant Hometowns)

Local municipalities where Industry Participants partaking in an Industry Event are located would benefit from hedging their risk regarding the outcome. In addition to safety and security concerns noted above, the local municipality may wish to host a celebration, such as a parade, to fete the victorious Industry Participant. In such a circumstance, the local governments would be at risk of a major outlay to host a celebration. Hedging this exposure would mitigate the economic impact to local municipalities' budgets.

5. Airlines

Airlines and other travel-related industries would benefit from being able to hedge their exposure for an anticipated major commercial event such as an Industry Event. Airlines take on risk as

they prepare for surge in travel demand because they must increase flights and capacity to accommodate the influx of fans to and from particular locations.

6. Stadium and Arena Owners and Operators

The owners and operators of the stadium or arena in which an Industry Event is held would benefit from being able to hedge the risk of hosting such a massive event. The stadium or arena owners and operators take on risk as they make a substantial investment in hosting an Industry Event and must account for insurance, weather-related incidents, vendors, workers' compensation, sponsors, security, and other third-party service providers. As the production inputs of an Industry Event increase, the stadium owners and operators would benefit from being able to hedge these operational risks based on the outcome of the event.

7. Broadcast and Streaming Companies

Broadcast and streaming companies would benefit from hedging the risk associated with bidding on the broadcast rights to an Industry Event. Bids to air the Industry Event require billions of dollars, and come with the risk that the association participants playing will not be able to develop an audience that would allow the broadcast or streaming companies to recoup their costs. Additionally, the broadcast and streaming companies face operational risks, such as lag or dead air, that would threaten their reputation and their financial wellbeing. The competitiveness and outcome of the Industry Event influences overall viewership that influences a broadcaster's willingness to bid on the broadcast rights.

8. Insurance Companies

Insurance companies would benefit from being able to hedge the risks presented to them by insuring occurrences and developments related to an Industry Event. Insurance companies take on a variety of risks relating to an Industry Event in terms of individual homeowner policies as well as large policies insuring the venue itself, whether in the city where an Industry Event is located or in the hometowns of the association participants in an Industry Event that year. Homeowner's insurance claims place insurers at risk during the Industry Event due to large group gatherings with increased grilling, fires, and alcohol, which all have the potential to lead to an increased volume of claims. Policies ensuring the venue itself pose exposure to the insurance companies that write the respective policies if an emergency occurs. Therefore, insurance companies would benefit from having the ability to hedge these risks associated with the outcome of the Industry Event.

* * * * *

Trading in the Event Contract would also offer market participants the opportunity to engage in price discovery related to the economic outcome, one of the key benefits of transacting in a

regulated exchange environment. With millions in viewership and billions of dollars in revenue, each Industry Event presents unique risks and opportunities for market participants to optimize through business decision-making, from merchandising choices to insurance policy writing. By offering the Event Contract on a CFTC-registered exchange such as CDNA, market participants can take advantage of the transparency, liquidity, efficiency and real-time pricing adjustments of a regulated, exchange-trading environment. Industry Events provide a massive pool of consumer data—offering market participants access to that data would enhance informed decision-making about how to mitigate risks and adjust their risk profiles, thereby establishing a fair market value and supply for their goods and services. The establishment of the true price gives participants an opportunity to engage in calculated risk-mitigation and risk-taking to best achieve their goals and benefit the public and communities they serve.

Based on the above, the Event Contract would allow market participants access to a product that would meet their legitimate hedging needs and allow for efficient and accurate price discovery in these markets.

## DESIGNATED CONTRACT MARKET ("DCM") CORE PRINCIPLES

The Exchange has identified the following DCM Core Principles as potentially being impacted by the launch of the Event Contract: Core Principle 2 (Compliance with Rules), Core Principle 3 (Contracts Not Readily Subject to Manipulation), Core Principle 4 (Prevention of Market Disruption), Core Principle 7 (Availability of General Information), Core Principle 8 (Daily Publication of Trading Information), and Core Principle 18 (Recordkeeping).

### A. Core Principle 2 Compliance with Rules

Core Principle 2 requires the DCM to have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the contract market. The Exchange has a dedicated Compliance/Regulatory staff that monitors the markets, investigates potential rule violations, and imposes sanctions against individuals who have been determined to have violated the Rules. The Exchange has an automated trade surveillance system, SCILA, which is capable of detecting potential trade practice violations, and also conducts real-time market monitoring of all trading activity in all Contracts, at all hours the Exchange is open. The Exchange is able to set the parameters by which the system detects potential issues. Chapter 9 of the Exchange Rulebook sets forth the Exchange's authority to investigate and sanction Members for activity that violates the Exchange Rules. Exchange Rule 2.10 grants the Exchange jurisdiction over any Person initiating or executing a transaction on or subject to the Rules of the Exchange, either directly or through an intermediary, and any Person for whose benefit such transaction has been initiated or executed. The Exchange's jurisdiction continues notwithstanding the termination of the Person's Exchange Membership. Exchange Rule 3.3 requires all Trading Members and Authorized Traders to comply with the Exchange Rules and to cooperate with the Exchange promptly and fully in any investigation, call for information, inquiry, audit, examination or proceeding. Such cooperation may involve a request for the Member's or Authorized Trader's activity in the relevant Underlying. Accordingly, the listing of the Event Contract will not negatively impact the Exchange's ability to comply with this Core Principle.

The Exchange certifies that its surveillance program together with its participation in a key industry group for information sharing and regulatory coordination addresses the requirements of Core Principle 2.

### B. Core Principle 3 Contracts Not Readily Subject to Manipulation and Core Principle 4 Prevention of Market Disruption

Core Principles 3 and 4 (Contracts Not Readily Subject to Manipulation and Prevention of Market Disruption), implemented by Commission Regulations 38.200 and 38.250, require a DCM

to list only contracts that are not readily susceptible to manipulation and to prevent market disruption. The Exchange has at least one existing Market Maker that has committed to providing liquidity in these contracts, which should limit opportunities for markets in the Event Contract to be manipulated. As previously stated, the Exchange also uses the SCILA surveillance system to assist with market monitoring and has a staff dedicated to market surveillance to detect potential market manipulation.

The Exchange has dedicated staff to conduct surveillance of the market and uses the SCILA surveillance system to assist with market monitoring at all times the Event Contract will be listed.

The Exchange trading system has a cap-check feature that ensures a trader has sufficient funds in the account to fully collateralize the Order if executed before the Order is accepted by the Exchange. The Exchange also has the ability to block new Orders and/or cancel working Orders if necessary to prevent market disruption.

Additionally, Commission Regulation 38.256 requires a DCM to have the ability to comprehensively and accurately reconstruct all trading on its trading facility. The Exchange is currently able to reconstruct trading in its markets based on the data stored in the database, the SCILA surveillance system, as well as the Exchange log files. Trade data will continue to be stored in this same manner following the addition of the Event Contract. Therefore, the addition of these contracts will not negatively impact the Exchange's ability to comply with these Core Principles.

C. <u>Core Principle 5 Position Limits</u>

Core Principle 5 requires the DCM set position limits or position accountability to reduce the potential threat of market manipulation or congestion. The Exchange has set the initial position limit for Trading Members at 2,500 Contracts, thereby reducing the motivation for an individual to manipulate the Underlying in order to affect the Exchange settlement, explained in detail above. Market Makers will not be subject to the 2,500 Contract position limit in order to provide sufficient liquidity to the market. Market Makers will instead be subject to an Alternative Position Limit of 250,000 Contracts. A Market Maker taking advantage of the Alternative Position Limits must, within one business day following a request by the Exchange's Compliance Department, provide the Exchange Compliance Department with a trade register detailing all trading activity in any account owned or controlled by the Market Maker in the relevant Underlying during the 15 minutes immediately before and after any Expiration time identified by the Exchange's Compliance Department in the request.

D. Core Principle 7 Availability of General Information and Core Principle 8 Daily Publication of Information

Core Principles 7 and 8, implemented by Commission Regulations 38.400, 38.401, 38.450, and 38.451, require a DCM to make available to the public accurate information regarding the contract terms and conditions, as well as daily information on contracts such as settlement price, volume, open interest, and opening and closing ranges. The Exchange makes the Exchange Rulebook available on its website, as well as the Daily Bulletin which contains the preceding required information. The Results page on the website also publishes the Expiration Value and Settlement Value for all the Exchange contracts settled during that week. Contract specifications for the new Event Contracts will likewise be set forth in the Rulebook and on the Exchange website. Settlement prices, volume, open interest, and opening and closing ranges for the Event Contract will be included on the Daily Bulletin and posted on the Exchange website. Therefore, the addition of the Event Contract will not negatively impact the Exchange's ability to comply with these Core Principles.

E. Core Principle 9 Execution of Transactions

Core Principle 9 requires the DCM to provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process. The Exchange has [one] dedicated Market Maker[s] that have committed to pricing a two-sided market. Market participants are able to view the orderbook up to five layers deep (depending on the market activity at any particular time) on the platform. The Exchange displays the Time and Sales of all Contracts traded on the Exchange website which is updated every 15 minutes. Therefore, the addition of the Event Contract will not negatively impact the Exchange's ability to comply with this Core Principle.

F. Core Principle 10 Trade Information

Core Principle 10 requires the DCM to maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manger that enables the contract market to use the information to assist in the prevention of customer and market abuses and to evidence any violations of the Exchange Rules. The Exchange maintains an electronic audit trail as required by the Commission Regulations which enables the Exchange to review all activity on the Exchange.

G. Core Principle 11 Financial Integrity of Transactions

Core Principle 11 requires the DCM to establish and enforce rules and procedures for ensuring the financial integrity of transactions entered on the contract market. As with all Contracts offered on the Exchange, the Event Contract will be fully collateralized and Members entering a

transaction will have knowledge of their maximum risk prior to executing a transaction. All transactions will be cleared by CDNA's registered derivatives clearing organization.

H. Core Principle 12 Protection of Markets and Market Participants

Core Principle 12 requires a DCM to protect markets and market participants from abusive practices committed by any party and to promote fair and equitable trading on the contract market. Chapter 5 of the Exchange Rulebook establishes Rules to protect the market and market participants from abusive, disruptive, fraudulent, noncompetitive, and unfair conduct and trade practices. The Rules apply to all market participants and transactions on the Exchange, and participants will need to comply with the Rules when trading the Event Contract.

I. Core Principle 18 Recordkeeping

Finally, Core Principle 18, implemented by Commission Regulation 38.951, requires a DCM to maintain records of all activities relating to the business of the DCM, (i) in a form and manner that is acceptable to the Commission, and (ii) for a period of at least 5 years. A DCM must maintain such records in accordance with the applicable requirements of Commission Regulations.

CONFIDENTIAL TREATMENT REQUESTED BY CDNA PURSUANT TO 17 CFR 145

## DCM CORE PRINCIPLES

| Core Principle Number | Core Principle Name | Addressed in or Not Applicable to Certification |
|---|---|---|
| 1 | Designation as Contract Market | Not applicable (designation granted) |
| 2 | Compliance with Rules | Addressed |
| 3 | Contracts Not Readily Subject to Manipulation | Addressed |
| 4 | Prevention of Market Disruption | Addressed |
| 5 | Position Limitations or Accountability | Addressed |
| 6 | Emergency Authority | Not applicable (the Exchange Rulebook, 2.4 Emergency Rules) |
| 7 | Availability of General Information | Addressed |
| 8 | Daily Publication of Trading Information | Addressed |
| 9 | Execution of Transactions | Addressed |
| 10 | Trade Information | Addressed |
| 11 | Financial Integrity of Transactions | Addressed |
| 12 | Protection of Markets and Market Participants | Addressed |
| 13 | Disciplinary Procedures | Not applicable (the Exchange Rulebook, Chapter 9 Rule Enforcement) |

| | | |
|---|---|---|
| 14 | Dispute Resolution | Not applicable (the Exchange Rulebook, 10.2 – 10.4 Arbitration) |
| 15 | Governance Fitness Standards | Not applicable (the Exchange Rulebook, 2.2 Service Restrictions, 11.2 Service and Disciplinary History) |
| 16 | Conflicts of Interest | Not applicable (the Exchange Rulebook, 2.6 Voting, 2.9 Trading Limitations, 11.1 Non-Public Information, 11.3 Voting) |
| 17 | Composition of Governing Boards of Contract Markets | Not applicable (internal review and appointment of directors) |
| 18 | Recordkeeping | Addressed |
| 19 | Antitrust Considerations | Not applicable |
| 20 | System Safeguards | Not applicable (internal controls and policies in place) |
| 21 | Financial Resources | Not applicable (capital requirements and quarterly reporting compliant) |
| 22 | Diversity of Boards of Directors | Not applicable (not public company, internal review and appointment of directors) |
| 23 | Securities and Exchange Commission | Not applicable |

CONFIDENTIAL TREATMENT REQUESTED BY CDNA PURSUANT TO 17 CFR 145